# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| INFORMATION ASSOCIATED WITH 4 | ) | Case No. 20-sw-01427-NRN |
| FACEBOOK USER IDs THAT IS STORED AT | ) | |
| PREMISES CONTROLLED BY FACEBOOK | ) | |
| INC., more fully described in Attachment A, | ) | |
| attached hereto. | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ___State and___ District of ___Colorado and elsewhere___ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    X  evidence of a crime;

    X  contraband, fruits of crime, or other items illegally possessed;

    X  property designed for use, intended for use, or used in committing a crime;

    ☐  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of Hobbs Act Robbery 18 U.S.C. § 1951 and Use of Firearm During a Crime of Violence, 18 U.S.C. § 924 (c), and the application is based on these facts:

    X  Continued on the attached affidavit, which is incorporated by reference.

    ☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*s/ Lynn Thrapp*
*Applicant's signature*

_____
Lynn Thrapp, Special Agent
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
                             xx submitted, attested to, and acknowledged by reliable electronic means.

Date: ___11/25/2020___

_____
*Judge's signature*

City and state: ___Denver, CO___

_____
Magistrate Judge N. Reid Neureiter
*Printed name and title*

<u>**ATTACHMENT A**</u>

**Property to be Searched**

This warrant applies to information associated with the Facebook user ID's

1) https://m.facebook.com/profile.php?id=100009478020421 "Kitira DaGoon"
2) https://www.facebook.com/profile.php?id=100050569002325 "Taylor Made"
3) https://www.facebook.com/bird.boochie "Bird Boochie"
4) https://www.facebook.com/tayloramanda.shayeisaac "Taylor Amanda Isaac"


 that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

ver. 4/20 w/o Prospective Location Information

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

I.   <u>**Information to be disclosed by Facebook**</u>

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A for the time period of October 14, 2020 to November 25, 2020:

(a)   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)   All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)   All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)   All profile information; News Feed information; status updates; videos, photographs, articles, links, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

ver. 4/20 w/o Prospective Location Information

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 DAYS of issuance of this warrant.

**II.     Information to be seized by the government**

2

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Hobbs Act Robbery, 18 U.S.C. § 1951 and Use of Firearm During a Crime of Violence, 18 U.S.C. § 924(c) involving HAYS, VARGAS, and ISAAC, since October 14, 2020, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Evidence of the commission of the armed robberies, vehicular eluding and shooting (attempted homicide) of a Peace Officer, including preparatory steps taken in furtherance of the scheme and actions taken to avoid law enforcement;

(b) Evidence indicating how, when, and where the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e) Historical location information relevant to the crime sunder investigation and that helps identify the user of the account or events relating to the crimes to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner and the owner's contacts;

(f) The identity of the person(s) who communicated with the user ID about matters relating to firearms, armed robberies, stolen merchandise, eluding police and shooting a firearm at police, including records that help reveal their whereabouts.

## III.    Order Of Non-Disclosure

Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), the Court orders Facebook not to disclose the existence of this search warrant to any person for the period of one year, including the subscriber, other than its personnel essential for compliance with the execution of this warrant.

ver. 4/20 w/o Prospective Location Information

# AFFIDAVIT

I, Lynn Thrapp being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief

## INTRODUCTION AND AGENT BACKROUND

1. Your Affiant is a full time salaried law enforcement officer for the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and has been so since October 14th, 2018. Your Affiant, ATF Special Agent Lynn Thrapp #6224, has a Bachelor of Arts degree in Psychology with a Minor in Linguistics from the University of Colorado Boulder.  Your affiant worked for 4 years in Juvenile Corrections in Greeley Colorado, and for 1 year as a Community Safety Official at the University of Colorado Boulder Police Department. Your Affiant is a graduate of the Criminal Investigator Training Program from the Federal Law Enforcement Training Center and of Special Agent Basic Training from the ATF National Academy.  Your Affiant is currently assigned to the ATF Denver Field Division's Crime Gun Intelligence Center and is also a member of Colorado's Regional Anti-Violence Enforcement Network (RAVEN), a task force comprised of multiple federal and local law enforcement agencies formed to investigate criminal networks and gun crimes that cross the geographical boundaries of Colorado. As part of my training and experience, I have participated in investigations involving electronic evidence, emails, text messages, and the Internet.

2. I make this affidavit in support of an application for a search warrant for information associated with certain Facebook user IDs that are stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause that evidence, fruits, and instrumentalities of violations of Hobbs Act Robbery, 18 U.S.C. § 1951 and Use of Firearm During a Crime of Violence, 18 U.S.C. § 924 (c) (the "Subject Offenses") are present at the location described.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the Subject Offenses have been committed by Kitira HAYS, David VARGAS, and Taylor ISAAC.  There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## BACKGROUND ON FACEBOOK

6. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

7. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date,

gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

8.  Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

9.  Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

10.  Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

11.  Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

12.  Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

13.  If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

14.  Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

15.  Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages,

among other things.

16. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

17. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

18. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

19. Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

20. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

21. Some Facebook pages are affiliated with groups of users, rather than one individual user.  Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter.  Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group.  Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

22. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

23. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

24. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions

ver. 4/20 w/o Prospective Location Information

taken by the provider or user as a result of the communications.

25. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

26. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## **PROBABLE CAUSE**

27. On November 14, 2020, at approximately 1851 hours, Lakewood Police Department officers responded to a call of a robbery at the Foot Locker store located at 7273 W Alaska Drive, Lakewood, CO. Officers learned that a Hispanic male and a Hispanic female had come into the Foot Locker, and began grabbing clothing. The male suspect then brandished a silver revolver. The male suspect then told the store employee something to the effect of, "This is my first time…don't do anything stupid." The male and female suspects then took the clothing, and fled in a dark colored sedan in an unknown direction.

28. A short while later, at approximately 1938 hours, Westminster Police Department officers responded to a call of a robbery at the DSW located at 9380 Sheridan Boulevard, Westminster CO. Officers learned a Hispanic male and a Hispanic female had come into the store and put five pairs of shoes onto the checkout counter. The male suspect then brandished a revolver and pointed it at the store clerk. The male and female suspects then took the shoes and fled in an unknown direction in an unknown vehicle. When interviewing witnesses and reviewing surveillance footage, investigators believe that the male and female suspect in both robberies appear to be the same two people based off of their physical descriptions and clothing.

29. Later that night, at approximately 2337 hours, Deputy Marcus Knight from the Adams County Sheriff's Office ("ACSO") was in the area of Broadway and W 66th Avenue when he observed a black Nissan sedan traveling at a high rate of speed northbound on Broadway. Deputy Knight attempted to conduct a traffic stop of the vehicle utilizing his emergency lights and siren; however, the vehicle failed to stop and eluded his patrol car.

ver. 4/20 w/o Prospective Location Information

30. Other patrol vehicles attempted to stop the Nissan sedan; however, it continued to elude officers, traveling at a high rate of speed and switching lanes in a reckless manner, including at one point veering into oncoming traffic. ACSO deputies attempted to utilize stop sticks to stop the vehicle, but the effort was unsuccessful. Deputy Knight reported that after the attempt to use the stop sticks failed, he heard gunshots and aired that he had been fired upon. While continuing the pursuit, Deputy Knight could see the passenger of the vehicle with his arm out the window, pointing the long barrel of a gun at Deputy Knight.

31. The pursuit of the Nissan sedan continued, and deputies continued to be fired at by the occupants of the Nissan. The vehicle then entered a mobile home park located at 5250 W 53rd Avenue, Arvada, CO. Deputy Knight reported that he could see the passenger inside of the vehicle lining him up in the sights of a gun. The Nissan sedan then crashed into a parked SUV. ACSO deputies converged on the area, with Deputy Knight arriving first. Deputy Knight was shot at by the occupants of the vehicle and Deputy Knight fired back at the vehicle, and reported seeing two suspects emerge from the vehicle and flee on foot.

32. Due to the amount of law enforcement officers in the area, ACSO deputies were able to establish a perimeter quickly, but were unable to locate the suspects. K9 dogs were utilized and tracked a scent to the northwest corner of the lot; however, the suspects still were not found. Investigators believe that it is possible the suspects knew someone in the area and were able to hide from deputies until law enforcement had completed their search. ACSO deputies secured the Nissan sedan. A search warrant was authored for the vehicle and approved by the Adams County Judge, Honorable Emily Lieberman. Deputies executed the search warrant and found a silver Ruger GP100 .357 revolver, a Samsung cellphone and an LG cellphone, and a fanny pack with a lanyard that said "DAVID" on the outside and contained a Colorado Identification card for David VARGAS. Deputies also recovered a Colorado identification card and an ATM/debit card for a Taylor ISAAC. In the trunk, investigators found merchandise with security tags still attached which linked to both the Foot Locker and DSW robberies.

33. Investigators contacted the registered owner of the vehicle, Valentina Tafoya. Tafoya told investigators that the car was hers, but that it was used primarily by her daughter, Sabrina Fierro. Investigators interviewed Fierro on November 17, 2020. Fierro initially told investigators that she did not know her car was taken and had not given anyone permission to use her car. Fierro admitted that she knew VARGAS and ISAAC, and consented to a download of her phone. Investigators found Facebook contacts in Fierro's phone between Fierro and VARGAS, and Fierro and an individual named Kitira HAYS. Investigators also saw a text message to Veronica VARGAS, the sister of David VARGAS. At 3:23AM on November 15, 2020, a message from Fierro's phone was sent to Veronica VARGAS that read, "I wanted to tell you I love you sis thank you for everything you done for me please tell the kids and are brothers I love them. I wouldn't change my family at all. I might be gone for awhile or for ever. Just know you're the greatest." Veronica VARGAS later responded, asking what was going on. At 11:55AM on November 15, 2020, a link to a 9News story with the headline "Shots fired at deputy during pursuit in Adams County, according to Sheriff's Office" was sent from Fierro's phone to Veronica VARGAS. Investigators believe VARGAS was using Fierro's cell phone to send these messages to his sister.

34. ACSO investigators conducted a follow-up interview with Fierro on November 19, 2020. During that interview, Fierro admitted that Kitira HAYS, Taylor ISAACC, and David VARGAS were all at HAYS' house earlier in the day on November 14, 2020. Fierro stated that she had a conversation with HAYS on Monday (November 16, 2020) during which HAYS said ISAAC, VARGAS, and HAYS went to a DSW shoe store and robbed it. According to Fierro, HAYS said ISAAC showed a firearm to a store clerk at DSW and they stole several pairs of shoes. Fierro stated that HAYS said they got into a chase with the police and shots were fired. HAYS stated that she thought she shot David VARGAS with a gun while they were trying to get out of the car after crashing, but later learned she did not shoot him. Investigators showed Fierro still images obtained from surveillance cameras from the Foot Locker robbery on November 14, 2020. Fierro positively identified ISAAC and VARGAS from the images.

ver. 4/20 w/o Prospective Location Information

35. On November 19, 2020, Detective Shearer conducted two photo lineups with one of the Foot Locker clerks who was present during the robbery.  The clerk, G.H, identified VARGAS as the Hispanic male involved in the robbery as an 85-88% possibility.  G.H also identified another male in the lineup as a possibility with 70% certainty. G.H went on to say that what stood out to him about the male suspect was his neck tattoo. G.H then identified ISAAC as the Hispanic female in the robbery as an 85% possibility. However, he later changed it to 90% after viewing the photograph a second time.  G.H also identified another individual in the lineup as a 60% possibility.

36. The Samsung and LG cellphones that were found in the vehicle were later each attributed to VARGAS and HAYS.  Investigators also found a fingerprint on the front passenger door of the Nissan sedan that belonged to HAYS.  Investigators learned HAYS has an address associated to her in the same trailer park where the pursuit ended, 5250 W 53rd Avenue, unit #102.

37. HAYS was arrested on November 17, 2020 for an arrest warrant issued due to a probation violation. Your Affiant listened to jail calls from HAYS to an unknown recipient where HAYS was crying, stating that she was looking at "Felony ones" and that "I didn't go in…but around me went in…around me is dumb." HAYS also told the individual she was speaking with, "They can't prove it's me."  Your Affiant knows through her training and experience that class one ("F1") felonies are felony charges such as first degree murder, which, given the context of the call, could encompass shooting at a police officer if the police officer were shot and killed.  Your Affiant notes that prior to the beginning of the jail call, an automatic recording plays informing the caller that their calls may be monitored and recorded.

38. Investigators also received video surveillance footage from November 15, 2020 of the Comfort Inn and Suites located at 6th Avenue and Federal Boulevard. In the footage, investigators observed HAYS, VARGAS, Fierro and her three children, ISAAC, and VARGAS' brother Adan Vargas together at the hotel. The room was registered under Adan Vargas' name.

39. Investigators found a Facebook account with the profile name "Kitira DaGoon." Your Affiant viewed the profile, and observed multiple photographs of HAYS on the profile, with the most recent public post being on November 13, 2020.  Your Affiant has seen photographs of HAYS in law enforcement databases, and after comparing the photographs of HAYS to the photographs on the Facebook account "Kitira DaGoon", it is evident to your Affiant that the profile is owned and operated by HAYS.

40. Investigators found Facebook accounts with the profile names "Bird Boochie" and "Taylor Made."  Your Affiant viewed both profiles.   The background profile photo for the account "Bird Boochie" was VARGAS holding a child. Your Affiant has seen photographs of VARGAS and was able to identify the individual in the photograph as VARGAS. The profile photograph for "Taylor Made" was a photograph of ISAAC, with a background photo of the word "Boochie."  Your Affiant knows that VARGAS refers to himself as "Boochie."  Investigators also know that VARGAS and ISAAC are in a relationship.  It is evident to your Affiant that the profiles "Bird Boochie" and "Taylor Made" are owned and operated by VARGAS.

41. Investigators also found a Facebook account with the profile name "Taylor Amanda Isaac."  Your Affiant viewed the profile and observed multiple photographs of ISAAC on the account, to include the profile photograph.  Your Affiant has seen photographs of ISAAC and was able to identify ISAAC as the individual in the photographs on the account "Taylor Amanda Isaac." It is evident to Your Affiant that the profile "Taylor Amanda Isaac" is owned and operated by ISAAC.

42. The investigation has revealed that HAYS, VARGAS and ISAAC routinely use their Facebook accounts to communicate via Facebook Messenger. Your Affiant knows through her training and experience that criminals often communicate before, during, and after their crimes.  Specifically, they communicate with co-conspirators about the planning, execution, and escape from the crime.  Additionally, social media such as Facebook, is commonly used to brag about crimes committed, such as robberies or high-speed pursuits.

Furthermore, investigators believe that HAYS, VARGAS, and ISAAC had previously engaged in thefts of merchandise in order to sell the merchandise to other individuals for profit.  It is believed that they had the same intent with the merchandise stolen in these robberies and because they use Facebook to communicate with others via Messenger, there is reason to believe that their Facebook accounts will contain these communications.  Therefore, Your Affiants believes that is it likely there will be communications about the above-mentioned offenses within the Facebook accounts belonging to VARGAS, HAYS, and ISAAC.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

43. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## REQUEST FOR NON-DISCLOSURE

44. Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), I request the Court order Facebook not to notify any other person of the existence of this warrant for the period of one year.  This request is made because notification of the existence of the warrant will result in flight from prosecution, tampering with evidence, or tampering with witnesses to this crime.

45. For the same reasons, I respectfully request that this affidavit and the Court's Order be RESTRICTED at level 3 until further order of this Court.

## CONCLUSION

46. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

47. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

ver. 4/20 w/o Prospective Location Information

48. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses may be located within the Facebook accounts described in Attachment A.

49. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.


_s/ Lynn Thrapp_
Lynn Thrapp, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives


SUBSCRIBED and SWORN before me this _____25th_____ day of November, 2020.


HON. N. REID NEUREITER
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO


Application for search warrant was reviewed and is submitted by Celeste Rangel, Assistant United States Attorney.

ver. 4/20 w/o Prospective Location Information